IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

ROBERT D. JOHNSTON; and
MELANIE K. JOHNSTON                                                    PLAINTIFFS

                v.                        Civil No. 06-3002

JASON BRISCO, in his official
capacity as an officer of the Harrison
Arkansas Police Department and in his
individual capacity; et al.,                                          DEFENDANTS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Before the undersigned for report and recommendation are the motions for summary

judgment filed by separate defendants Danny Hickman, Jason Day, and Boone County (Doc.

170)(the County Defendants), and separate defendants Jason Brisco, Lyle Smith, and Paul

Woodruff (Doc. 184)(the City Defendants). The plaintiffs responded to the County Defendants'

motion (Doc. 195) and the City Defendants' motion (Doc. 206).

## BACKGROUND

Robert and Melanie Johnston live in Missouri and were returning home on Saturday,

January 3, 2004, traveling northbound on Highway 65 when Officer Jason Brisco of the Harrison

Police Department began traveling behind their vehicle. *County Defts' Exhibit* 1 at 8-9 & 65;

*City Defts' Ex.* 7 at ¶ 2-3. Robert Johnston was driving a Toyota 4-Runner and Melanie Johnston

and their two children were passengers in the vehicle.[1] *County Defts' Ex.* 1 at page 10 & page

12; *Affidavit of Robert Johnston* (Doc. 204) at ¶ 2.

---

[1] To avoid confusion, we will refer to the Johnstons by their first names.

-1-

Melanie testified Robert had the cruise control set and was traveling at a rate of speed that was four miles under the speed limit. *County Defts' Ex.* 1 at 68-69. Robert stated they previously noted the cruise control was "four miles per hour slower than what the speedometer read, by checking what the Arkansas Department of Highways and Transportation mobile radar unit registered." *Robert's Affidavit* (Doc. 204) at ¶ 2. *See also Melanie's Affidavit* (Doc. 205) at ¶ 2.

Robert noted the officer behind him and paid "close attention" to the road and was sure "to use [his] signals and such." *Robert's Affidavit* at ¶ 3. Melanie testified she did not know what the posted speed limit was. *County Defts' Ex.* 1 at 69. Melanie noticed the patrol car coming up close behind them and then backing off and then coming close again. *County Defts' Ex.* 1 at 69. The Johnstons believed Brisco was probably trying to force them into making a driving error. *Id.*

In Melanie's estimation, Brisco followed the vehicle for approximately ten miles before he pulled them over. *County Defts' Ex.* 1 at page 9. Robert estimated the patrol car followed them for ten minutes before they neared the Harrison city limits. *Robert's Affidavit* at ¶ 3. Robert felt the officer was "riding [his] tail" and trying to push him to go faster. *Id.*

Melanie believes Brisco was well outside the city limits of Harrison when he began following them. *County Defts' Ex.* 1 at 9-10. However, Brisco did not put his lights on and pull the vehicle over until they were within the city limits. *Id.*

At approximately 10:00 p.m., the Johnstons pulled off the road into a gas station, Bypass Exxon. *County Defts' Ex.* 1 at page 13 & 71. There were people standing just outside the door of the station and on the sidewalk. *Id.* at 72. Robert felt is was a safe place for them to stop.

-2-

*Robert's Affidavit* at ¶ 5.  *See Melanie's Affidavit* at ¶ 9 (Robert "pulled into a gas station so that we would be in a lighted environment, with other people present.").

Brisco approached the vehicle and obtained Robert's driver's license and insurance information and returned to the patrol car.  *County Defts' Ex.* 1 at 10.  When Robert asked why Brisco had stopped them, Brisco replied they had been going "six over back by Ben Eddings." *County Defts' Ex.* 1 at 72.  Ben Eddings is a local business.

Robert asserts that Brisco had a "rather rude attitude."  *Robert's Affidavit* at ¶ 6.  Robert also states he knew Brisco's claims that he was speeding and driving all over the road were untrue.  *Id.*  Nevertheless, Robert states, although he knew better, he cooperated and gave Brisco his driver's license and insurance card.  *Id.* at ¶ 7.

Brisco noted that the insurance card had expired and asked if they had a different one. *Melanie's Affidavit* at ¶ 14.  Melanie replied that the policy was current but that she had not replaced the card.  *Id.*

Robert indicates he was then puzzled by Brisco's action of backing away from the Johnstons' vehicle.  *Robert's Affidavit* at ¶ 7.  The children were asleep in the backseat.  *Id.* at ¶ 8.

After what the Johnstons describe as a lengthy period of time, several minutes, they indicate Brisco again approached the car and demanded that Robert get out.  *County Defts' Ex.* 1 at 10 & 74; *Robert's Affidavit* at ¶ 9; *Melanie's Affidavit* at ¶ 19 (Brisco returned pulling on some gloves and told Robert to get out).  Robert asserts Brisco's attitude was even more arrogant.  *Robert's Affidavit* at ¶ 9.

-3-

Robert asked why but Brisco refused to state a reason for wanting Robert to get out of the vehicle. *County Defts' Ex.* 1 at 10. Robert states he was very concerned about the nature of Brisco's business and asked "why, what did I do?" *Robert's Affidavit* at ¶ 10. When Brisco replied that he just wanted to talk to Robert, Robert stated "we are all family, we can talk here." *Id.* at ¶ 11. Robert states he tried calming Brisco down but he was "hell bent on getting [Robert] out of the vehicle without cause, or reason." *Id.* at ¶ 12. When Robert did not get out of the vehicle, Melanie indicates Brisco became angry, his eyes were bulging, and he told Robert to get out. *Melanie's Affidavit* at ¶ 23.

After repeated threats made by Brisco of "get out or I'll pull you out" or "I'll bust your window," Robert states he knew they were in a grave situation. *Robert's Affidavit* at ¶ 13. *See also County Defts' Ex.* 1 at 10. Robert did not comply. *County Defts' Ex.* 1 at 75. Robert asked for an attorney. *Id.* at 78.

When Robert did not get out of the car, Melanie contends Brisco pulled out a telescoping weapon, some kind of a club, and threatened to bust out the car window. *County Defts' Ex.* 1 at 11 & 76. Robert indicates at this point he was stiff from driving for ten to twelve hours because of chronic back pain and he asked Brisco for help getting out of the car. *Robert's Affidavit* at ¶ 14. Robert maintains Brisco replied: "Get out and I'll give you help." *Id.* at ¶ 15.

At this point, Melanie asserts she had begun to wonder if Brisco was a genuine officer or someone impersonating an officer. *Melanie Affidavit* at ¶ 30. She then saw Robert glance toward the passenger side. *Id.* at ¶ 31. When Melanie looked, she states she observed another man on that side of the vehicle reaching for the door handle of the passenger door. *Id.*

-4-

At about this time, Robert maintains Brisco lunged into his window, which Robert indicates was halfway up to keep out the rain. *Robert's Affidavit* at ¶ 16. As Brisco lunged, Robert maintains Brisco hit Robert's face with the baton. *Id.*

Brisco hit the driver's side window glass causing it to break and also hit the car where the Johnstons' son was sitting. *County Defts' Ex.* 1 at 11-12; *Robert's Affidavit* at ¶ 18. Although Brisco indicates that his arm was caught in the window when the Johnstons attempted to drive away and he was forced to break the window, Melanie testified this was a "contrived lie." *County Defts' Ex.* 1 at 98. She maintains Brisco's arm was not in the window. *Id.*

Melanie also testified that Brisco reached into the car and grabbed Robert and hit him in the face. *County Defts' Ex.* 1 at 12 & 77. After the window broke, the Johnstons drove away. *Id.* at 12; *Melanie's Affidavit* at ¶ 32 & ¶ 33. If they hadn't driven away, Melanie testified she believed the violence would have only escalated. *County Defts' Ex.* 1 at 79.

Robert asserts they left the scene because he believed Brisco must have made a mistaken identification and confused them with a dangerous person. *Robert's Affidavit* at ¶ 19. Robert maintains he left the scene in hopes of resolving the matter in a less violent way. *Id.* Melanie maintains they had concluded there was clearly a case of mistaken identity and they needed to get to Taney County, Missouri, where they lived and were known, to get the matter resolved. *Melanie Affidavit* at ¶ 43.

Brisco's version of the encounter differs from the Johnstons. Brisco testified he first saw the Johnston vehicle when he was on Valley Springs on his way to Harrison. *Plffs' Ex.* A at 4 (attached to Doc. 210). Brisco testified it was speed that first attracted him to the Johnston

vehicle. *Id.* Brisco knew the vehicle was speeding because he looked at his speedometer. *Id.* at 6. Brisco was speeding at the time. *Id.*

Valley Springs is outside the city limits of Harrison. *Plffs' Ex.* A at 4-5 (attached to Doc. 210). Brisco cannot stop a vehicle outside the Harrison city limits. *Id.* at 5 & 7. He had no reason to believe that the occupants of the vehicle had committed any crime. *Id.* at 5.

Brisco followed the Johnston vehicle from Valley Springs to Harrison. *Plffs' Ex.* A at 4-5 (attached to Doc. 210). Once in Harrison, Brisco contacted dispatch to request information about the vehicle. *Id.* at 5. He was provided with the name and vehicle information. *Id.* at 7.

Brisco asserts that he witnessed the Johnstons' vehicle weave onto a curb, travel on the side of the road above the curb, and then come back down onto the highway. *City Defts' Ex.* 7 at ¶ 4. Brisco states the Johnstons were also traveling six miles over the post speed limit. *Id.* at ¶ 5.

According to Brisco, he then turned on his in-dash video recorder and continued traveling behind the Johnstons' vehicle. *City Defts' Ex.* 7 at ¶ 6. The dash camera in his vehicle can be turned on and off. *Plffs' Ex.* A at 7 (attached to Doc. 210). The audio can be turned on and off separately. *Id.* at 7-8. The dash camera does not record the radar. *Id.* at 8.

Brisco saw the Johnstons' vehicle cross the traffic lines of the highway and weave close to the curb on at least five occasions. *City Defts' Ex.* 7 at ¶ 7. As the Johnston vehicle arrived at a well lighted area, Brisco indicates he initiated a traffic stop. *Id.* at ¶ 8; *Plffs' Ex.* A at 9 (attached to Doc. 210). By affidavit, Brisco indicated he had probable cause for the stop based on the vehicle driving left of center, speeding, and because he had reason to believe the operator was under the influence of a drug or alcohol. *City Defts' Ex.* 7 at ¶ 5, ¶ 9 & ¶ 11. In his

-6-

deposition, Brisco testified he was stopping the vehicle for speeding and driving left of center. *Plffs' Ex.* A at 9 (attached to Doc. 210).  Brisco testified he initially intended to give Johnston a written warning for these offenses rather than a citation.  *Id.* at 11-12.

After the Johnstons pulled into an Exxon station, Brisco got out of his car and approached.  *City Defts' Ex.* 7 at ¶ 11.  Robert rolled down his window.  *Id.* at ¶ 12.  Brisco indicates that he advised Robert he was concerned about his driving because he was all over the road and going six over the speed limit.  *Id.*  When Brisco asked Robert for his driver's license and proof of insurance, Robert acted nervously and was fidgeting.  *Id.* at ¶ 13.  Robert's behavior at this point was cooperative and polite.  *Plffs' Ex.* A at 12 (attached to Doc. 210).

Brisco testified he did not notice there were children in the back of the vehicle.  *Plffs' Ex.* A at 12 (attached to Doc. 210).  He did see some clothes and a blanket in the rear of the vehicle. *Id.*

Brisco went to his patrol unit to run a check on the license and registration.  *City Defts' Ex.* 7 at ¶ 15.  Brisco walked backwards to his vehicle for safety reasons.  *Plffs' Ex.* A at 14-15 (attached to Doc. 210).  Brisco did not write the warning ticket while he was in his vehicle.  *Id.* at 12.  When Brisco ran Robert's license, Brisco received no information to suggest that Robert had committed any crime.  *Id.* at 15.

Brisco turned the audio off on the dash camera for a period of time because he was speaking with Officer Toland.  *Plffs' Ex.* A at 16 (attached to Doc. 210).  Toland asked Brisco if he needed assistance.  *Id.*  Brisco responded that he was going to do a field sobriety test.  *Id.* Brisco did not smell alcohol on Robert and had not asked him if he had been drinking.  *Id.*

-7-

Brisco testified he did not have any evidence to suggest Robert was under the influence of anything. *Id.* at 17.

Brisco returned to the vehicle and asked Robert to step out of the vehicle because Brisco wanted to speak to him. *City Defts' Ex.* 7 at ¶ 16. Robert refused. *Id.* at ¶ 17. Brisco testified he first asked Robert to get out of the vehicle and then when Robert refused commanded him to exit the vehicle. *Plffs' Ex.* A at 13 (attached to Doc. 210). At this point, Brisco maintains Robert was no longer being courteous and police because he did not obey Brisco's command to exit the vehicle. *Plffs' Ex.* A at 13 (attached to Doc. 210).

Brisco indicated Robert would have gotten an explanation when he got out of the vehicle. *Plffs' Ex.* A at 14 (attached to Doc. 210). Brisco wanted Robert to get out of the vehicle for a field sobriety test. *Id.*

Brisco repeated his request. *City Defts' Ex.* 7 at ¶ 17. Robert again refused and stated the "good Lord told me I cannot get out." *Id.* at ¶ 19. As Robert made this statement, he began rolling up his window. *Id.* at ¶ 20.

Brisco placed his left hand on the glass to prevent it from being rolled up all the way. *City Defts' Ex.* 7 at ¶ 21. Brisco maintains he repeatedly told Robert to get out of the car. *Id.* at ¶ 22.

At one point, Brisco indicates Robert stated he needed help. *City Defts' Ex.* 7 at ¶ 25. Brisco did not ask Robert what type of help he needed. *City Defts' Ex.* 14 at 23.

Instead, Brisco asserts he responded that he wanted to give Robert help and to roll down the window. *City Defts' Ex.* 7 at ¶ 25; *City Defts' Ex.* 14 at 23. At the time, Brisco had his Asp

-8-

baton drawn.  *City Defts' Ex.* 14 at 23.  Brisco drew the baton after the second or third time

Robert refused to exit the vehicle.  *Plffs' Ex.* A at 18 (attached to Doc. 210).

The baton is used for striking and/or striking people.  *Plffs' Ex.* A at 17 (attached to Doc.

210).  Brisco had the baton out because Robert rolled the window up.  *Id.*  Brisco testified he did

not intend to strike Robert.  *Id.*  Brisco was wearing gloves because it was cold out and had put

them on before he made the stop.  *Id.* at 18.

Brisco indicates he then told Robert if he did not roll the window down Brisco would

bust it out with his baton.  *City Defts' Ex.* 7 at ¶ 23.  Brisco maintains he told Robert to get out

of the car and roll the window down at least ten times.  *Id.* at ¶ 24.

Brisco also recalled that Robert asked to call an attorney.  *Plffs' Ex.* A at 20 (attached to

Doc. 210).  Brisco responded:  "No."  *Id.*

When another officer arrived on the scene for backup, the Johnstons turned their heads.

*City Defts' Ex.* 7 at ¶ 26.  At this point, Brisco indicates he reached his right hand into the vehicle

in an attempt to unlock the driver's side door.  *Id.* at ¶ 27-28.  *See also Plffs' Ex.* A at 52

(attached to Doc. 210).  Brisco maintains he did not hit Robert.  *City Defts' Ex.* 14 at 23.  *See*

*also Plffs' Ex.* A at 23-24 (attached to Doc. 210)(I reached both arms into the vehicle and had

my baton out.  I did not hit, grab, or even touch Robert.).  The Johnstons then began screaming

and Robert shifted the car into drive and began to drive away.  *City Defts' Ex.* 7 at ¶ 29.

Brisco indicates his left hand was still inside the vehicle as the Johnstons started to drive

away.  *City Defts' Ex.* 7 at ¶ 30.  *See also Plffs' Ex.* A at 26-27 (attached to Doc. 210)(My left

arm was caught in the window where my watch is.  When the vehicle started moving, I made the

decision to break the window).  To free his hand, Brisco states he struck the window with his

baton to break the glass as the Johnstons were driving away. *City Defts' Ex.* 7 at ¶ 32. Brisco asserts that he used the reasonable amount and degree of force reasonably necessary to prevent the Johnstons from endangering his life. *Id.* at ¶ 33.

Brisco struck the vehicle twice. *Plffs' Ex.* A at 28 (attached to Doc. 210). The first strike was to free his arm. *Id.* The second strike was just instinct–he kept striking until the threat went away. *Id.*

A copy of the dash camera video tape has been submitted to the court as *City Defts' Ex.* 15. When the tape begins, at approximately time stamp 22:23:10, the patrol unit is following behind the Johnston vehicle. During a portion of the video, the edge of the highway is marked with a white line or fog line.

At time stamp 22:25:00, the vehicle appears to veer slightly to the right and near or cross over the fog line. *City Defts' Ex.* 15. At time stamp 22:27:45, the car appears to cross over the center line of the road on a curve. *Id.* Shortly thereafter, beginning at time stamp 22:28:07, the car veers slightly to the left and appears to cross the center line. *Id.* At time stamp 22:28:42, the car veers slight to the left and comes close to the center line. *Id.* At time stamp 22:29:41, the car crosses the lane divider lines. *Id.* However, when the car changes lanes it uses it signals. *Id.*

At time stamp 22:30:36, Brisco pulls the Johnstons' car over utilizing his lights and siren. *City Defts' Ex.* 15. The audio recording is difficult to understand. *Id.* Initially, this difficulty appears to stem from the fact that music, apparently from the patrol unit's radio, can be heard playing. *Id.* Brisco approaches the Johnston car and begins speaking with Robert indicating he was concerned about Robert's driving. *Id.* Brisco can be head informing Robert that he was

-10-

speeding.  *Id.*  Brisco then obtains Robert's license and registration or insurance.  *Id.*  Brisco backs away from the Johnston car and returns to the patrol unit.  *Id.*

At 22:35:51, Brisco returns to the car.  *City Defts' Ex.* 15.  Brisco can be heard telling Robert that he needs to talk to him and step out of the vehicle.  *Id.*  This is repeated several times. *Id.*

Brisco then tells Robert to roll down the window or Brisco will bust it out.  *City Defts' Ex.* 15.  Brisco repeatedly tells Robert to roll down the window.  *Id.*  Robert can be heard stating that "we are all family here, we can talk."  *Id.*  Robert can be heard stating that he can't get out because the "good Lord told me I cannot get out."  *Id.*

Robert indicates that he needs help.  *City Defts' Ex.* 15.  Brisco replies that he wants to help Robert and for him to roll the window down.  *Id.*

During this exchange, Brisco is standing next to the driver's window it appears with his left hand on the window.  *City Defts' Ex.* 15.  When another officer arrives, he stands on the passenger side of the vehicle towards the rear of the vehicle.  *Id.*

When the other officer arrives, Brisco reaches his arm into the car and the brake lights flash on.  *City Defts' Ex.* 15.  Melanie can be heard saying: "Do not."  *Id.*  As the vehicle starts to drive away, Brisco strikes twice at the vehicle.  *Id.*  It appears that he strikes first the driver's door window and then the rear driver's side window.  *Id.*

At 22:37:57, the Johnston vehicle can be seen quickly leaving the Exxon station.  *City Defts' Ex.* 15.  The tape then shows Brisco and other vehicles pursuing the Johnstons down a number of streets in Harrison and onto various highways and roads outside Harrison.  *Id.*  During

-11-

the pursuit, the Johnston vehicle can be seen running a number of stop signs, driving across at least one yard, and taking various actions to avoid the police cars pursuing. *Id.*

A narrative report prepared by Brisco indicates the pursuit lasted one hour and twenty-two minutes and covered one hundred and twelve miles. *Plffs' Ex.* 2 (attached to Doc. 210). Speeds reached 105 miles per hour. *Id.*

After they left the Exxon, Melanie indicates they were followed by Brisco and other police cars. *County Defts' Ex.* 1 at 13. Melanie characterized the pursuit as a "low speed chase" and indicated the highest speed their car attained was 75. *County Defts' Ex.* 1 at 15.   At one point, Melanie testified the officers attempted to block the Johnstons in but they were unsuccessful. *Id.* at 84.

The Johnstons did not pull over again because they had already been assaulted by an officer. *County Defts' Ex.* 1 at page 16.  They had a 22 Ruger pistol under one of the seats. *Id.* The pistol was not loaded although there were shells for the gun in a bag inside the glove box. *Id.* at page 17.

Hickman first became aware of the pursuant after the Johnstons left the Harrison city limits. *Plffs' Ex.* 1 at 4 (Doc. 197).  During the pursuit, the Johnstons crossed into Missouri and then back into Arkansas. *Id.*  After the Johnstons returned to Arkansas, Hickman met up with officers who were out but not in pursuit to maintain safety. *Id.*  The only information Hickman had at the time was that a pursuit was going on. *Id.*

After an hour or more, the officers shot at the Johnstons car. *County Defts' Ex.* 1 at page 18.  Melanie saw an officer in a shooting stance, heard shots fired, heard shots hit the car, and has a bullet that was extracted from one of the tires. *Id.*  She believes at least two bullets hit the

-12-

tire. *Id.* at 83.  To her knowledge there were no bullet holes in the car except for in the tires.  *Id.*

at 19.  One bullet was removed from a tire and she believes one bullet exited the tire.  *Id.* at 19.

The car then left the road, went down a hill, and among some trees before it came to a

stop. *County Defts' Ex.* 1 at 20.  No police were around the car when it came to a stop.  *Id.* at

21.

The Johnstons got out of the car and walked away from the car but did not go back

toward the road. *County Defts' Ex.* 1 at page 21.  In Melanie's words, they were attempting to

evade injury by the police and running for their lives.  *Id.* at 21 & 31  They did not take anything

from the car with them-- not even their coats.  *Id.* at 31.  With respect to the gun, Melanie

testified they did not even recall the gun was in the car until they were told about it by the police.

*Id.* at 26-27.

After the Johnstons left their vehicle, Hickman called a helicopter to join in the search.

*Plffs' Ex.* 1 at 4-5 (Doc. 197).   Hickman testified there were signs there might have "been

weapons and stuff" for the safety of people in the county he believed it was necessary to use

other resources.  *Id.* at 5.

After they saw what was in the car, Hickman testified they realized there were children

in the vehicle.  *Plffs' Ex.* 1 at 6 (Doc. 197).  Hickman testified none of his officers were involved

in shooting at the Johnston vehicle and he was not aware that there might have been a shot fired

until later on that evening.  *Id.*

According to Melanie, the Johnstons were lost in the woods until daybreak.  *County*

*Defts' Ex.* 1 at 22.  They could hear all terrain vehicles, dogs, see spotlights shining in the woods,

and heard a helicopter. *Melanie's Affidavit* at ¶¶ 48-49.  They were all dressed in jeans and tee-

-13-

shirts. *County Defts' Ex.* 1 at 22.  Her son got sick during the night.  *Id.* at 85.  At daybreak, the Johnstons found a farm and some outbuildings.  *Id.* at 23.  They spent an hour or more in an outbuilding attempting to get warm.  *Id.*  When they could not get warm, they entered the home through the kitchen window.  *Id.*  There was no phone in the house.  *Id.* at 24.

They got some blankets and dry clothes and then slept.  *County Defts' Ex.* 1 at 24.  When they woke up, they got some food for their children.  *Id.*  They then packed some supplies and were going to try to walk to their home in Missouri which was about sixty or seventy miles.  *Id.* at 24-25.  They aborted their plan and came back to the farm house immediately.  *Id.*

The Johnstons remained at the farm house until sometime in the evening on Monday, January 5, 2004, when SWAT arrived.  *County Defts' Ex.* 1 at 26.  According to Hickman, on January 5th, county and state officers went to the farmhouse to apprehend the Johnstons.  *Plffs' Ex.* 1 at 7 (Doc. 197).  Hickman was not at the scene.  *Id.* at 8.  He did not believe the children were ever considered a threat.  *Id.*  He did not know why the children were forced to lie spread eagle on the ground.  *Id.*

According to Melanie, when SWAT using a megaphone told Robert to come out with his hands up, he went to the window and asked officers for an opportunity for them to put their own clothes on.  *County Defts' Ex.* 1 at 26.  The Johnstons then left the house.  *Id.*  All four of them were required to lie face down spread eagle on the porch.  *Id.* at 27.  Guns were pointed at them and the police had dogs there.  *Id.*

Robert was handcuffed and taken to a squad car while Melanie was handcuffed and taken back in the house with her children.  *County Defts' Ex.* 1 at 27.  The Johnstons' belongings were

-14-

gathered and then Melanie and her children were put in a squad car and transported to Harrison. *Id.*

After they got to jail, Melanie was told to shower and change into a jail uniform. *County Defts' Ex.* 29. She was then informed by a Department of Human Services (DHS) employee that her children were going to be taken away from her. *County Defts' Ex.* at 29. Melanie asked that the children go to their grandparents, Roberts' parents. *Id.* at 30.

Following her discussion with the DHS employee, Melanie was interviewed by Bob King and Paul Woodruff. *County Defts' Ex.* 1 at 32. She was asked about the events of the night of January 3rd. *Id.* According to Melanie, Woodruff also lied to her and told her that the children had lice. *Id.*

Melanie was then taken to a cell and she maintains she was left there for two days without being allowed to make a phone call. *County Defts' Ex.* 1 at 33. She was charged with aggravated assault on a police officer, felony fleeing, endangering the welfare of a minor, carrying a weapon, burglary, and theft. *Id.* at 33-34.

Melanie contends the bail set on them was excessive because they had "actually" committed no crimes. *County Defts' Ex.* 1 at 53. She contends they were not a flight risk. *Id.* at 53-54.

The Johnstons retained Johnny Nichols to represent them in January of 2004. *County Defts' Ex.* 1 at 147. On January 9, 2004, the plaintiffs appeared in court before Judge John Putman. *Complaint* at ¶ 73. They were represented by Johnny Nichols. *Id.* Plaintiffs indicate they were both charged with aggravated assault on Brisco as a result of a lie he told. *Id.* at ¶ 74. Specifically, plaintiffs maintain Brisco lied about his arm being caught in the window. *Id.*

-15-

On January 13, 2004, plaintiffs appeared before Judge Gary Isbell and were given an immediate unsupervised extended home visit with their children. *County Defts' Ex.* 1 at 148-149; *Complaint* at ¶ 77. Melanie points out there were documents filed in the juvenile court case that state the children should remain in the custody of DHS because of the continued incarceration of the Johnstons. *County Defts' Ex.* 1 at 148-149. This was true despite the fact that it was well known to everyone in the courtroom that they were not incarcerated at the time. *Id.* In fact, Melanie states they appeared in their own clothing and were given permission to travel from the hearing to Yellville to get the children for an extended home visit. *Id.* at 149.

It was four more weeks, on February 13, 2004, before the Johnstons got custody of their children back following a second hearing. *County Defts' Ex.* 1 at 157 & 160. During this time, the children were in the custody of DHS. *Id.*

In the interim, on February 4, 2004, Johnny Nichols withdrew in the criminal case. *County Defts' Ex.* 1 at 125 & 147. The Johnstons hired Erwin Davis to represent them on February 4, 2004. *County Defts' Ex.* 1 at 112-113 & 124. During the period of time Davis represented them, the Johnstons were not in jail. *Id.* at 113. Davis arranged for Nichols to continue to represent the Johnstons in connection with the case pending in juvenile court regarding their children. *Id.* at 125 & 147.

The Johnstons believed Davis should have moved for dismissal of the charges against them. *County Defts' Ex.* 1 at 114. Furthermore, Davis requested a continuance of the trial that was scheduled for June 21 or June 22, 2004, despite the Johnstons' stating that they did not want a continuance. *Id.* at 114. Davis was allowed to withdraw in October of 2004. *Id.* at 112 & 125.

-16-

Approximately ten months after the traffic stop, based on what Melanie testified was a "falsified" lab analysis, the Johnstons were charged with the simultaneous possession of drugs and a firearm. *County Defts' Ex.* 1 at 90-91. The charges were later dropped. *Id.* at 91.

The Johnstons retained Michael Dodson and Joseph Paul Smith in early April of 2005. *County Defts' Ex.* 1 at 35, 112 & 180. The Johnstons, who had been representing themselves, had a court appearance scheduled for April 8, 2005, and had been given until that day to retain new counsel. *Id.* at 180-181. Melanie testified she requested that Dodson enter an appearance on their behalf and that he file a motion for change of venue or a motion asking the judge to recuse. *Id.* at 181. The Johnstons did not plan to attend the hearing. *Id.* at 183-184.

On the morning of April 8, 2005, Dodson phoned the Johnstons and told them he had been instructed by the Judge that the Johnstons had to appear at the Boone County Courthouse in Harrison that day. *County Defts' Ex.* 1 at 35 & 186. Depending on traffic, it takes the Johnstons between an hour and an hour and a half to travel from their home to the courthouse in Harrison. *Id.* at 187.

When they were a couple of blocks from the courthouse, Melanie testified Dodson called one of their cell phones to advise them that police were waiting on the courthouse lawn for them and they should exit their car with their hands in the air. *County Defts' Ex.* 1. at 35-36, 188 & 192. At some point, Dodson indicated it was a "show of force." *Id.* at 188. The Johnstons had their children with them. *Id.* After discussing it, the Johnstons decided they did not want the children to witness a show of force against their parents and didn't want the children to be taken from their custody again. *Id.* at 188-189. The Johnstons decided to turn around and not go to the courthouse. *Id.* at 189. Melanie testified she informed Dodson this was what they intended

-17-

to do and he should go ahead and make a motion for change of venue and fight for their rights. *Id.*

According to the deposition of Danny Hickman, the Boone County Prosecuting Attorney's Office had received evidence from the Taney County, Missouri, authorities that threats had been made. *City Defts' Ex.* 11 at page 9. Specifically, Robert allegedly told friends that April 8th would be a day of reckoning in Boone County. *Id. See also Plffs' Ex.* 1 at 10 (Doc. 197).

Hickman received the information either late in the evening on April 7th or early morning on April 8th. *Plffs' Ex.* 1 at 11 (Doc. 197). The threat was taken seriously since it involved a judge and the courthouse. *Id.* Hickman did not have time to investigate the threat. *Id.*

Hickman also testified he was told "they were possibly gathering guns up and they was going to be coming to Boone County for a day of reckoning" on the Johnstons' court date. *City Defts' Ex.* 11 at 10. In response, the courthouse was made secure. *Id.* At the request of the Boone County Sheriff's Office, the Harrison Police Department sent five of its officers to the courthouse on April 8, 2005. *City Defts' Ex.* 12 at 11. The Boone County Sheriff's Office had five or six officers there including Hickman. *Plffs' Ex.* 1 at 14 (Doc. 197).

Hickman told the Johnstons' attorney to have the Johnstons come directly to Hickman and he would make sure they got into the courthouse safely. *Plffs' Ex.* 1 at 12 (Doc. 197). Hickman indicated they had no intention of apprehending the Johnstons. *Id.* at 13. Instead, they only intended to protect everyone at the courthouse. *Id.* Three doors of the courthouse were locked and all people entering had to go through a metal detector. *Id.* at 14. The Johnstons

would have gone through metal detectors. *Id.* If they had guns, it would have been dealt with at that time. *Id.*

Melanie testified they believed since they had counsel to represent them they did not have to be at court. *County Defts' Ex.* 1 at 36. However, Melanie indicated Dodson made it clear to them that their leaving was against his recommendations. *Id.* at 189.

Melanie indicated they had filed a complaint with the Arkansas Judiciary Discipline Committee against Judge Webb. *County Defts' Ex.* 1 at 36. One of the things Dodson was going to address that day was their request that Webb recuse himself and also ask for a change of venue. *Id.* at 36. However, Melanie indicates their requests were denied and warrants issued for their arrest for felony failure to appear. *Id.* at 36.

When the Johnstons left Harrison, they went home. *County Defts' Ex.* 1 at 192. They then left for Colorado that day. *Id.* at 140 & 194. The Johnstons were arrested at a friend's house in Weld County, Colorado, on April 27, 2005. *County Defts' Ex.* 1 at 39, 111 & 196.

The Johnstons were in jail in Colorado approximately eleven days. *County Defts' Ex.* 1. at 40. They were then transported back Arkansas and arrived on May 8th and were placed in Boone County Jail. *Id.* at 41 & 199. On May 20th, a bond hearing was held on the failure to appear charges. *Id.* at 199-200.

Melanie remained in jail until she signed a plea agreement on July 22, 2005. *County Defts' Ex.* 1 at 42. She contends she was incarcerated under unconstitutional conditions including the following: she was not allowed to make phone calls; she was denied access to law books; male jailers were constantly at the side of women inmates while women jailers rarely made an appearance; she was housed with convicted felons; the meals she was served were not

-19-

nutritious; the bed linens were not changed; she was forced to shower in front of a window; and she was not allowed outside exercise for weeks at a time. *County Defts' Ex.* 1 at 46, 48-49.

On July 22, 2005, Dodson and Joseph Paul Smith informed plaintiffs a plea agreement had been worked out for them that involved probation for both the plaintiffs. *County Defts' Ex.* 1 at 208-209. The Johnstons indicated they would accept the agreement, even though they were not guilty, in the interest of being with their children again. *Id.* at 210.

A short time later, Dodson and Smith came back and said the agreement included a short prison sentence for Robert but he wouldn't ever actually see the inside of the prison. *County Defts' Ex.* 1 at 211. Just prior to going into court that day, the Johnstons were presented with a plea agreement which indicated Roberts was going to receive a three year prison sentence. *Id.* at 212. Dodson and Smith indicated Robert would probably do all the time in Boone County or perhaps go to diagnostics to be evaluated for health reasons. *Id.* at 212-213.

Melanie entered into three separate plea agreements on July 22, 2005. *City Defts' Ex.* 1-3. The first plea agreement covers Boone County Circuit Court case no. 2004-03-4 and indicates Melanie was charged with the following offenses: simultaneous possession of drugs and firearms; aggravated assault on a law enforcement officer, three counts; fleeing in a vehicle; possession of a controlled substance, methamphetamine; endangering the welfare of a minor, second degree, two counts; and carrying a weapon, two counts. *City Defts' Ex.* 1. The agreement provided that the State would dismiss the charges of simultaneous possession of drugs and firearms, possession of a controlled substance, endangering the welfare of a minor, and carrying a weapon in return for Melanie pleading guilty to one count of aggravated assault

-20-

(Officer Brisco) and fleeing in a vehicle.  *Id.*  The agreement indicated Melanie would receive a sentence of five years probation to run concurrently on each felony count.  *Id.*

The second plea agreement covers Boone County Circuit Court case no. 2004-11-3 and indicates Melanie was charged with residential burglary and theft of property.  *City Defts' Ex.* 2.  Melanie agreed to plead guilty in return for a sentence of five years probation on the burglary charge and one year probation on the theft of property charge with the terms of probation to run concurrently.  *Id.*

The third plea agreement covers Boone County Circuit Court case no. 2005-104-4 and indicates Melanie was charged with failure to appear.  *City Defts' Ex.* 3.  Melanie agreed to plead guilty in return for a sentence of five years probation.  *Id.*

Robert also entered into three separate plea agreements on July 22, 2005.  *City Defts' Ex.* 4-6.  The first plea agreement covers Boone County Circuit Court case no. 2004-04-4 and indicates Robert was charged with the following:  simultaneous possession of drugs and firearms; aggravated assault on a law enforcement officer, three counts; fleeing in a vehicle; possession of a controlled substance, methamphetamine; endangering the welfare of a minor, second degree, two counts; carrying a weapon, two counts; reckless driving; and speeding in excess of fifteen miles per hour over the posted limit.  *City Defts' Ex.* 4.  The agreement provided the state would dismiss the charges of simultaneous possession of drugs and firearms, possession of a controlled substance, endangering the welfare of a minor, carrying a weapon, reckless driving, and speeding in return for Robert pleading guilty to one count of aggravated assault (Officer Brisco) and felony fleeing.  *Id.*  Robert was to receive a sentence of three years in the Arkansas Department of Correction to run concurrently on each count.  *Id.*

-21-

The second plea agreement covered Boone County Circuit Court case no. 2004-10-4. *City Defts' Ex.* 5. This agreement indicates Robert was charged with residential burglary and theft of property. *Id.* The agreement was that Robert would plead guilty in return for a sentence of five years probation on the burglary count and one year probation on the theft of property count with the terms of probation to run concurrently. *Id.*

The third plea agreement covers Boone County Circuit Court case no. 2005-105-3. *City Defts' Ex.* 6. This agreement indicates Robert was charged with failure to appear. *Id.* Robert agreed to plead guilty in return for a sentence of five years probation. *Id.*

By affidavit, Paul Woodruff states he is an officer with the Harrison Police Department. *City Defts' Ex.* 8 at ¶ 2. Prior to doing an interview with Melanie at the Boone County Sheriff's Department, Woodruff states he had been told by a DHS employee that the Johnston children had lice. *Id.* at ¶ 8.

With respect to any statements he made to the local newspaper regarding the Johnston case, Woodruff asserts the statements were true to the best of his knowledge at the time he made the statements. *City Defts' Ex.* 8 at ¶ 9. During his deposition, Woodruff indicated in response to a question from the newspaper he had stated that no drugs or alcohol had been found. *City Defts' Ex.* 13 at 8.

With respect to the box of evidence, Woodruff states he transported a box of evidence related to the Johnstons' criminal case to the Arkansas State Crime Lab in Little Rock. *City Defts' Ex.* 8 at ¶ 4. *See also City Defts' Ex.* 13 at 9. Woodruff indicates he did not know what was in the box, did not open the box, did not remove anything from the box, and did not add anything to the box. *City Defts' Ex.* 8 at ¶ 5-6. Woodruff did not do the chemical analysis on

-22-

anything that might have been submitted as evidence related to the prosecution of the Johnstons. *Id.* at ¶ 7.

Woodruff indicated he went to the courthouse on April 8, 2005, in response to information received regarding the Johnstons. *City Defts' Ex.* 13 at 12. Woodruff had been informed by the sheriff's office that a threat had been made to court personnel by the Johnstons. *Id.* at 13. Woodruff believed it was a threat of violence. *Id.*

The court has also been provided with the affidavit of Lyle Smith, the Chief of Police of the Harrison Police Department. *City Defts' Ex.* 9 at ¶ 2. Smith asserts he was not present at the initial stop of the Johnstons, the pursuit, or any of the events giving rise to the lawsuit. *Id.* at ¶ 5-7.

Smith asserts he has never had to discipline Brisco for the use of excessive force, there has never been an excessive force lawsuit filed against Brisco, and there have been no citizen complaints about Brisco using excessive force. *City Defts' Ex.* 9 at ¶ 9-11.

The complaint asserts sixteen separate counts. In count one, plaintiffs allege a violation of their First Amendment rights. Specifically, they allege they were denied the right to have the facts of their case heard. *Complaint* (Doc. 86) at ¶ 128. They maintain Judge Webb refused to rule on motions filed in his court or even acknowledge their multiple requests that he review the facts of the case, the evidence of their innocence, and the violations of their civil rights.

In count two, plaintiffs allege a violation of their Second Amendment right to keep arms. They point out a pistol that was in their vehicle was seized by the Harrison Police Department. *Complaint* at ¶ 132. They allege the pistol remains in the possession of the police department and all motions to return the seized property have been ignored by the State of Arkansas and

-23-

Judge Webb. *Id.* Further, they allege their right to keep arms has forever been infringed by their forced acceptance of the false felony charges. *Id.* at ¶ 133.

In count three, plaintiffs allege violations of their Fourth Amendment right to be free from unreasonable searches and seizures. Plaintiff allege Brisco had no reason to demand that Robert exit his vehicle. *Complaint* at ¶ 138. Further, they allege the property that was seized was not illegal to possess and was not used in any crime. *Id.* at ¶ 139. Plaintiffs allege "defendants" failed to provide acceptable standards of management, training, supervision, and discipline of the officers and agencies. *Id.* at ¶ 140. It is alleged "defendants" knew of this unconstitutional conduct being endured by the plaintiffs and failed to take corrective action. *Id.*

In count four, plaintiffs allege violations of the Fifth Amendment right to due process. Specifically, they allege they were deprived of their freedom and property although they had committed no crime. *Complaint* at ¶ 144. They indicate an indictment was issued by Fred Kirkpatrick based on a false affidavit prepared by Brisco. *Id.* They assert a probable cause order was signed by Judge Putman although he had spoken to neither of the plaintiffs. *Id.* at ¶ 145. Further, plaintiffs allege they were denied the right to contact anyone, denied the right to a prompt first appearance, and denied the right to a formal arraignment. *Id.* at ¶ 146.

In count five, entitled violation of Sixth Amendment right to trial by an impartial jury, plaintiffs allege that they hired counsel to assist in their defense, Nichols, Davis, Dodson, and Smith, and no counsel assisted or defended them. *Complaint* at ¶ 153. Plaintiffs allege Nichols, Davis, Dodson, and Smith acted contrary to plaintiffs' bests interests and direct instructions. *Id.* Plaintiffs allege the defendants acted under the color and pretense of state law, statutes, ordinances, regulations, or customs. *Id.* at ¶ 155. It is further alleged defendants adopted a

-24-

policy of the wrongful execution of judgments and deprivation of due process rights and other civil rights of citizens including the plaintiffs.  *Id.*

In count six, plaintiffs allege a violation of the Eighth Amendment prohibition against excessive bail and cruel and unusual punishment.  Plaintiffs allege excessive bail was set in January of 2004 and again in May of 2005.  *Complaint* at ¶¶ 160-161.  Further, they contend the amount of the fines were excessive.  *Id.* at ¶ 162.

Plaintiffs allege the "show of force" orchestrated against the Johnstons was cruel and unusual and an attempt was made to vilify them through a slanderous report in the newspaper. *Complaint* at ¶ 163.  They maintain the custodial interference and disruption of their serene family life amounted to cruel and inhumane punishment inflicted on the entire family.  *Id.* at ¶ 164.

In count seven, plaintiffs assert violations of their Fourteenth Amendment Due Process Right to a Fair and Impartial Trial.  Plaintiffs maintain Judge Webb should have recused himself after they filed a complaint against him.  *Complaint* at ¶ 169.  Plaintiffs allege Nichols, Davis, Dodson, and Smith were employed to assist the plaintiffs and ensure their rights were exercised for their benefit.  *Id.* at ¶ 170.  Instead, it is alleged plaintiffs were denied such assistance and plaintiffs' rights were waived without their knowledge or consent.  *Id.*

Plaintiffs allege they were charged with, and arrested for, failure to appear when there was an armed force waiting for them at the courthouse.  *Complaint* at ¶ 171.  Plaintiffs maintain Dodson made an appearance for them but his appearance was not entered so that they could be falsely charged and forced into a plea agreement.  *Id.*

In count eight, plaintiffs assert violations of their Fourteenth Amendment Procedural Due Process rights.  Plaintiffs allege they were not provided with paperwork involving the case,

AO72A
(Rev. 8/82)

hearings on the custody issues were held ex parte, and they were informed of a court appearance with less than twenty-four hours notice. *Complaint* at ¶ 177. Plaintiffs allege their rights to procedural due process were violated. *Id.* at ¶ 178.

In count nine, plaintiffs asserts violations of 42 U.S.C. § 1981, Equal Rights Under the Law. Plaintiffs maintain their rights to the full and equal benefit of all laws and proceedings for the security of persons have been, and are being, violated by the defendants. *Complaint* at ¶ 183. Plaintiffs allege they were criminally charged based on the word of one lying individual *Id.* at ¶ 184. Plaintiffs assert they were denied proper proceedings in order to testify openly regarding the facts of the case. *Id.* at ¶ 185.

In count ten, plaintiffs assert general violations of their civil rights under 42 U.S.C. § 1983. They allege:

> Defendants, under color of statute, ordinance, or custom subjected the Plaintiffs to the deprivation of rights, privileges and immunities secured by the United States Constitution and laws including but not limited to: (a) Deprivation of the right to be secure in his person; (b) Deprivation of the protection against excessive bail, fines, and cruel and unusual punishment; (c) Deprivation of the right to due process at law; (d) Deprivation of the right of equal protection under the law; (e) Deprivation of the right to redress; (f) Deprived of rights to privileges [and] immunities of the law; (g) deprived of the rights of free speech; and (h) Deprived of the right to counsel and access to the courts.

*Complaint* at ¶ 193. They assert the defendants had the authority for, and were directly responsible for, the operation, training, and supervision of the Boone County Sheriff's Office and the Harrison Police Department. *Id.* at ¶ 194.

Count eleven, conspiracy to interfere with rights under 42 U.S.C. § 1985, alleges all defendants conspired to, and did deter, by force, intimidation, and threat the due course of justice with the intent to deny the plaintiffs the equal protection of the laws. *Complaint* at ¶¶ 200-201. Similarly, count twelve, action for neglect to prevent under 42 U.S.C. § 1986, alleges each and

-26-

every defendant had the opportunity and obligation to assist the plaintiffs in their pursuit of justice and instead chose to further the wrongs against the plaintiffs. *Id.* at ¶ 208.

Count thirteen purports to allege violations of 42 U.S.C. § 1988. Count fourteen is entitled "false imprisonment/wrongful execution of judgment." This count alleges that as the result of the wilful actions of each and every defendant the plaintiffs were imprisoned against their will and against the laws of the United States and their children illegally removed from their custody. *Complaint* at ¶ 218.

Count fifteen alleges a First Amendment retaliation claim. Plaintiffs assert that all of the defendants knowingly, with sadistic and malicious intent, acting in concert, attempted to circumvent justice by implementing and advocating a tidal wave of fear, intimidation, and violence against the plaintiffs. *Complaint* at ¶ 226.

Finally, in count sixteen, plaintiffs maintain that each and every defendant has violated RICO and caused the plaintiffs to be imprisoned against their will. *Id.* at ¶ 236. Defendants pattern of racketeering activity is alleged to include causing citizens to expend time for court appearances and expend money to pay court costs, fines, and fees as a result of defendants' unlawful acts, false reports, and false arrests. *Id.* at ¶ 233. Defendants are further alleged to discourage thorough investigations of underlying allegations of unlawful detainment, false reports, police brutality, and denial of due process. *Id.*

## DISCUSSION

As noted above, there are two separate motions for summary judgment pending. After setting forth the applicable standard, we will address each summary judgment motion in turn.

AO72A
(Rev. 8/82)

### *Summary Judgment Standard*

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists."  *Nat'l Bank of Commerce v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir.1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d 607 *(citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id. (citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

### *Motion for Summary Judgment by Danny Hickman, Jason Day and Boone County*

Danny Hickman, the Sheriff of Boone County, Arkansas, and Jason Day, Deputy Sheriff/Jail Administrator, move for judgment as a matter of law on the remaining claims against them.  They point out that on January 17, 2007 (Doc. 164), all claims under 42 U.S.C. §§ 1981, 1985, 1986, 1987, 1988 and RICO were dismissed with prejudice.  Moreover, the same order dismissed the claims brought under 42 U.S.C. § 1983 for false arrest/false imprisonment as barred by *Heck v. Humphrey*, 512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994).  This

-28-

leaves plaintiffs claims that Hickman is liable for the actions taken by the officers during the pursuit, including the firing of shots at the plaintiffs, the apprehension of the plaintiffs, the fact that charges were filed against them, the amount of bail that was set, and a show of force against them on April 8, 2005.  Additionally, plaintiffs contend their rights were violated in a number of ways by the conditions under which they were held at the Boone County Jail.[2]

**(A).** *Use of Force*

With respect to the alleged use of force by Brisco, the plaintiffs have admitted that Hickman has no responsibility for officers employed by the Harrison Police Department.  *See e.g., County Defts' Ex.* 1 at 42.  Plaintiffs are unable to identify the officer who allegedly fired shots at the tires of the plaintiffs' vehicle on January 3, 2004.  *Id.* at 18-19.  The only testimony offered suggesting the identity of the shooter indicates he is believed to have been Jerry Watts of the Arkansas State Police.  *See e.g., Plffs' Ex.* J at 7 (attached to Doc. 204).  Hickman obviously had no responsibility for officers employed by the Arkansas State Police.  *Id.*

Plaintiffs cannot identify the officers who were at the farmhouse, forced them to spread eagle, held guns on them, handcuffed them, and took them into custody.  *County Defts' Ex.* 1 at 28.  Hickman testified he was not present at the traffic stop, was not personally involved in the pursuit although he did go to the area the pursuit was being conducted in, and was not present at the farmhouse.  *Plffs' Ex.* 1 at 4-8 (attached to Doc. 197).

"Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights.  To establish personal liability of the supervisory defendants, [the

---

[2]The County Defendants argue they have been sued in their official capacities only. *See County Defts' Brief* (Doc. 171) at page 2.  However, a review of the complaint clearly shows that plaintiffs have sued Danny Hickman and Jason Day in both their official and individual capacities. *See Amended Complaint* (Doc. 86) at 1.

AO72A
(Rev. 8/82)

plaintiffs] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of [their] constitutional rights." *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007)(citation and internal quotation marks omitted). General responsibility for supervising the operations of a Sheriff's Department is insufficient to establish personal involvement. *Id.*

To the extent plaintiffs seeks to hold Hickman liable merely because he has supervisory authority over all county officers, this general supervisory authority is an insufficient basis to hold him liable. *See e.g., Kahle v. Leonard,* 477 F.3d 544, 550 (8th Cir. 2007)(A failure-to-supervise claim may be maintained only if the official demonstrated deliberate indifference or tacit authorization of the offensive acts).

Finally, with respect to the alleged show of force at the Boone County Courthouse, the County Defendants maintain the mere threat of force, without more, does not violate the constitution. The Eighth Circuit has held that a "threat constitutes an actionable constitutional violation only when the threat is so brutal or wantonly cruel as to shock the conscience, or if the threat exerts coercive pressure on the plaintiff and the plaintiff suffers the deprivation of a constitutional right." *King v. Olmstead*, 117 F.3d 1065, 1067 (8th Cir. 1997). Certainly the threat of the use of force, particularly deadly force, for no legitimate law enforcement purpose, could state a constitutional violation. *See e.g., Black v. Stephens*, 662 F.2d 181 (3d Cir. 1981)(plain-clothes officer's conduct in pointing his weapon at the head of a motorist, without any legitimate law enforcement purpose, was sufficient to satisfy the shocks-the-conscience standard). *See also Hawkins v. Holloway*, 316 F.3d 777, 787 (8th Cir. 2003)(sheriff pulling gun on employees and threatening to shoot them–genuine issue of material fact as to whether his conduct amounted to a sincere threat of violence rather than a joke–agreeing with *Black's*

-30-

holding that an official's threat to employ deadly force for no legitimate reason rises to a substantive due process violation).

In this case, however, Hickman testified at his deposition that law enforcement personnel were dispatched to the courthouse on April 8th in response to a report received from Taney County Missouri officials that a threat had been made by the plaintiffs. Although the plaintiffs may contend they were not a threat, nothing has been submitted to the court to dispute Hickman's assertion that such a report was received. The fact that this information was received by Hickman provides a legitimate reason for law enforcement personnel to be dispatched to the courthouse.

The Johnstons were represented by counsel and their counsel was present at the courthouse and speaking to them on their cell phone when they made the decision to not appear for court. The Johnstons had not witnessed the alleged use of force, spoken to Hickman or any other law enforcement personnel, and were not told by their attorney that they were going to be harmed, assaulted, or arrested when they arrived at the courthouse. Instead, they were merely told to get out of their car with their hands in the air. *See e.g., County Defts' Ex.* 1 at 36.

**(B).** *Criminal Charges and Setting of Bail*

The Arkansas Constitution provides that only a prosecutor can file a criminal information or indictment. *Ark. Const. amend.* 21, § 1. The filing of criminal charges and the choice of what charges to file is entirely within the prosecutor's discretion. *See e.g., State v. Murphy*, 315 Ark. 68, 864 S. W. 2d 842 (1992). A circuit judge has no authority to amend a charge brought by a prosecuting attorney. *See e.g., State v. Brooks*, 360 Ark. 499, 202 S.W. 3d 508 (2005).

-31-

A prosecuting attorney is an elected official. "The office of Prosecuting Attorney is a constitutional office which operates in a quasi-judicial capacity." *Venhaus v. Brown*, 286 Ark. 229, 232, 691 S. W. 2d 141 (1985). The prosecuting attorney performs his functions in a subdivision of the state, a district. *See e.g., Simes v. Crumbly*, 368 Ark. 1, ___ S. W. 3d ___ (2006); *Morrow v. Strait*, 186 Ark. 384, 53 S. W. 2d 857 (1932). In this case, the prosecuting attorney for the Fourteenth Judicial District.

"Incumbent prosecuting attorneys, like all Constitutional officers, have the right and the duty to perform the functions of their office until they are legally removed from office or legally disqualified to act." *Venhaus*, 286 Ark. at 232. The Circuit Courts have the authority to appoint a special prosecutor to assist in the investigation, indictment, and prosecution of a prosecuting attorney alleged to have committed a crime in his own district. *See e.g., Weems v. Anderson*, 257 Ark. 376, 516 S. W. 2d 895 (1974).

Similarly circuit and district judges are Constitutional officers who are elected to serve within a judicial district. Ark. Const. amend. 80, § 17. Judges, prosecuting attorneys and other State officers may be removed from office through impeachment. Ark. Const. Art. 15, § 1.

Bail is set by the judge. *See e.g.,* Ark. R. Crim. P. 8.3, 8.5 & 9.2. The amount of the bail rests in the reasonable discretion of the court. *See e.g., Foreman v. State*, 317 Ark. 146, 875 S. W. 2d 853 (1994).

To the extent plaintiffs' claims are based on the refusal of Hickman to bring criminal charges against various individuals including the prosecutor, the circuit judge, and the individual who threw a rock at their car, among others, the claims fail. A private citizen has no right to institute criminal prosecution. *See Diamond v. Charles,* 476 U.S. 54, 64-65, 106 S. Ct. 1697,

-32-

90 L. Ed. 2d 48 (1986); *In re Kaminski,* 960 F.2d 1062, 1064 (D.C. Cir. 1992) (private party lacks judicially cognizable interest in prosecution of another person); *Lopez v. Robinson,* 914 F.2d 486, 494 (4th Cir. 1990); *Cok v. Cosentino,* 876 F.2d 1, 2 (1st Cir. 1989).  Furthermore, failing to investigate and prosecute an offense does not give rise to liability under § 1983.  *See e.g., Scher v. Chief Postal* Inspector, 973 F.2d 682, 683 (8th Cir. 1992)(postal inspection service); *Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992)(police).  Finally, Hickman had no supervisory authority over either the prosecuting attorneys' office or the court.

### (C).  *Conditions of Confinement*

With respect to the plaintiffs' unconstitutional conditions of confinement claims, the County defendants present three arguments.  First, they contend they are entitled to judgment as a matter of law because the plaintiffs failed to exhaust their administrative grievance by utilizing the grievance procedure at the jail.  Second, defendants contend the claims are barred by the physical injury requirement of the Prison Litigation Reform Act.  Third, defendants maintain the plaintiffs allegations do not rise to the level of constitutional violations.

### *Exhaustion of Administrative Remedies*

Defendants first argue they are entitled to judgment as a matter of law because plaintiffs failed to fully exhaust the administrative remedies as to their claims of unconstitutional conditions of confinement.  Defendants maintain the same is true regarding the vague allegations plaintiff make concerning access to legal books and the ability to make phone calls.

During her deposition, Melanie was asked if she submitted grievances about all her problems at the jail.  *County Defts' Ex.* 1 at 52.  She responded:  "Not official grievances."  *Id.* When asked why not, she stated:  "What would it have changed."  *Id.*

In opposition, plaintiffs assert that Melanie did submit written complaints or grievances about some of her concerns and needs while in jail but not all of them. (Doc. 196 at 16).[3] Moreover, they assert the jail staff did not provide grievance forms to inmates. *Id.* Based on these facts, plaintiffs state Melanie responded as she did to the questions posed to her during her deposition. *Id.* With respect to Robert, plaintiffs states he made regular requests for grievance forms, rarely received them, but made many written and verbal requests to jail employees. *Id.* at 16-17.

According to plaintiffs, the grievance procedure at the Boone County Jail consists of an inmate requesting a grievance form from a jailer when the jailer appears at meal time. (Doc. 196 at 17). Sometimes after days of requesting a form, plaintiffs state that you might get a form or a piece of paper. *Id.* An inmate then writes down his complaint and returns it to a jailer at meal time. *Id.* According to plaintiffs, at no time did either of them receive any written response to any grievance. *Id.*

As amended by the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a) mandates exhaustion of available administrative remedies before an inmate files suit. Section 1997e(a) provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

The Supreme Court in *Booth v. Churner*, 532 U.S. 731, 738-39, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001) held that "exhaustion is required where administrative remedies are available

---

[3]Plaintiffs also maintain Melanie wrote letters to various entities, including the Department of Health, the Joint Commission on Accreditation, the American Civil Liberties Union, the Department of Justice, etc., in an effort to bring attention to the horrible conditions at jail. *See Plff's Ex.* 4 (attached to Doc. 197). These letters, of course, do nothing to establish that Melanie submitted grievances to officials at the Boone County Jail.

even if the available administrative remedies do not provide the precise, or full, relief sought." *Walker v. Maschner*, 270 F.3d 573, 577 (8th Cir. 2001). It rejected the idea that the PLRA allowed for a futility exception. *Booth*, 532 U.S. at 740-41.

Further, the term "administrative remedies" has been held to encompass remedies not promulgated by an administrative agency. *Concepcion v. Morton*, 306 F.3d 1347, 1352 (3d Cir. 2002). Specifically, it has been held that a grievance procedure contained in a handbook constitutes an available administrative remedy within the meaning of § 1997e(a). *Conception*, 306 F.3d at 1352. When all claims have not been exhausted, the case is subject to dismissal. *Kozohorsky v. Harmon*, 332 F.3d 1141 (8th Cir. 2003)(total exhaustion required); *Jones v. Norris*, 310 F.3d 610, 612 (8th Cir. 2002); *Graves v. Norris*, 218 F.3d 884, 885 (8th Cir. 2000).

We do not believe on the record before the court that the County defendants are entitled to dismissal of the conditions of confinement claims based on the plaintiffs' failure to exhaust administrative remedies. Melanie did admit during her deposition that she did not submit grievances regarding "all" of her complaints. However, her testimony does not establish that she did not submit "any" grievances.

Further, as plaintiffs point out, the County defendants submitted only Melanie's deposition in support of their argument that the plaintiffs failed to exhaust their administrative remedies–nothing is provided to the court regarding Robert or the grievances he submitted. In fact, other than the description contained in the plaintiffs' brief of the grievance procedure at the Boone County Jail, the summary judgment record contains no copies of grievances submitted by the plaintiffs and no affidavits by the County defendants or anyone working at the Boone

-35-

County Jail regarding the grievance procedure or establishing that no grievances were submitted by the plaintiffs regarding their conditions of confinement, etc.

### Physical Injury Requirement of the PLRA

The County defendants also contend the conditions of confinement claims are barred by the physical injury requirement of the PLRA. Defendants assert plaintiffs have not alleged and cannot prove that they suffered any physical injury as a result of the deplorable conditions in the Boone County Jail.

Codified as 42 U.S.C. § 1997e(e), section 803(d) of the Prison Litigation Reform Act of 1996 (PLRA) provides as follows:  "No Federal civil action may be brought by a prisoner confined in jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." This provision limits the ability of a prisoner to assert a lawsuit for non-physical injury. *See e.g., Harris v. Garner*, 216 F.3d 970, 974 (11th Cir. 2000). The application of the provision depends on the status of the plaintiff at the time the lawsuit is commenced. *Id.  See also Kerr v. Puckett*, 138 F.3d 321 (7th Cir. 1998)(§ 1997e(e) applies only to prisoners).

In this case, as plaintiffs correctly point out, they were not "prisoners" when this lawsuit was commenced. The physical injury requirement of the PLRA, § 1997e(e), therefore has no application.

### Failure to State a Claim

Defendants next argue that plaintiffs' unconstitutional conditions of confinement claims fail as a matter of law because the plaintiffs cannot demonstrate they suffered any injury or adverse health consequences as a result or their confinement or that the defendants knew of and

-36-

disregarded an excessive risk to plaintiffs health or safety.[4]   They point out plaintiffs' confinement was temporary.  Defendants maintain the plaintiffs allegations simply do not rise to the level of a constitutional violation.

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1719, 140 L. Ed. 2d 1043 (1998)(citation omitted).  The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).

In *Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006), the Eighth Circuit held that deliberate indifference is the "appropriate standard of culpability for all claims that prison officials failed to provide pretrial detainees with adequate food, clothing, shelter, medical care and reasonable safety." "A prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element. *Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004)(*citing Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)). "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's necessities. The defendants' conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of

---

[4]Plaintiffs argue the defendants are seeking a reversal of the court's earlier ruling on the motion to dismiss (Doc. 164).  Different legal standards apply to the two motions. *See Samuels v. Kansas City Mo. School District,* 437 F.3d 797, 801 (8th Cir. 2006)(If the evidence viewed in the light most favorable to the plaintiffs and giving them the benefit of all reasonable inferences shows there are no genuine issues of material fact, then summary judgment is appropriate); *Casazza v. Kiser*, 313 F.3d 414, 417-418 (8th Cir. 2002)(In ruling on a 12(b)(6) motion, the court accepts the allegations of the complaint as true and may dismiss the case only when it appears beyond doubt the plaintiffs can prove no set of facts in support of their claim that would entitle them to relief).  Furthermore, in connection with the summary judgment motion, the court is free to consider exhibits submitted by the parties. *See BJC Health System v. Columbia Cas.* Co., 348 F.3d 685, 687-688 (8th Cir. 2003)(In ruling on a motion to dismiss under Rule 12(b)(6), the court may not consider matters outside the pleadings such as written or oral evidence in support of, or opposition to, a pleading or the claims of the parties).

the prisoner" *Revels*, 382 F.3d at 875 (citations and internal quotation marks omitted). Deliberate indifference is established when the plaintiff shows "the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety." *Revels,* 382 F.3d at 875.

The Supreme Court has stated that "[n]othing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Wilson v. Seiter*, 501 U.S. 294, 305, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991). However, "[c]onditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise–for example, a low cell temperature at night combined with a failure to issue blankets." *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004)(*citing Wilson*, 501 U.S. at 304). The standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

Plaintiffs contend the food at the Boone County Jail was not nutritious and was not prepared under clean conditions. They assert that the containers in which the powdered milk was prepared went unwashed and the old milk residue soured.

Plaintiffs have submitted a record of the meals served on various days. *Plff's Ex.* 3 (attached to Doc. 196). This exhibit indicates meals were served at 7:00 a.m., 12 noon, and 5:00 p.m. *Id.* Breakfast typically consisted of an egg sandwich, a honey bun, coffee, milk and orange juice. *Id.* Lunch typically consisted of a peanut butter and jelly sandwich, a bologna sandwich, and milk. *Id.* Supper typically consisted of an unspecified TV Dinner, a fruit cup, bread, and

-38-

milk. *Id.* No portion size or nutritional information is contained on this exhibit. Defendants have submitted nothing to the court regarding the meals served at the Boone County Jail, whether those meals have been approved by a dietician, or whether the meals meet the caloric and nutritional needs of the inmates.

During the three months they were confined at the Boone County Jail, plaintiffs contend they did not receive an opportunity for outdoor exercise on a regular basis. Plaintiffs have submitted as an exhibit what appears to be the jail log which plaintiffs maintain establishes that during their incarceration at the Boone County Jail the male detainees were allowed outdoor exercise on only two occasions and the female detainees were allowed outdoor exercise on five occasions. *Plffs' Ex.* 4 (attached to Doc. 196)(5/12/05–females and males; 5/18/05–females and then listed separately cell 3 & 7 to yard call; 6/9/05–females; 7/13/05–females; 7/22/05–females and males). Plaintiffs assert that as many as five weeks passed without any outdoor exercise.

Although Melanie testified there was adequate space in her cell to exercises, defendants have provided the court with no information on whether Robert had adequate space to exercise in his cell. Moreover, defendants have provided the court with no information regarding the opportunity for exercise afforded to detainees in general, whether inside or outside, when outside exercise was offered and if outside exercise was always noted on the jail log.

Plaintiffs assert the air quality was unacceptable. They indicate the dirt within the ductwork was "abundant" and the vents coated in grime. Plaintiffs maintain Melanie developed wheezing in her chest. In the months of June and July, plaintiffs maintain the air conditioning was so frigid that they were forced to wear two pairs of socks and huddle under blankets constantly.

Plaintiffs point to the following deficiencies in the are of sanitation and personal hygiene: (1) they were not provided with, or allowed to possess, a towel in their cells; (2) cleaning supplies were only provided occasionally and the same cleaning rags were used for cleaning toilets and the tables; (3) trash was allowed to accumulate for days; (4) the male inmates often did not have toilet paper; and (5) the bed linens were not washed during their entire incarceration.

Defendants have provided the court with no information regarding any of the following: how often detainees were allowed to shower; whether detainees had access to basic hygiene supplies between showers; when cell areas and common areas of the jail were cleaned; when trash was removed from the cells and common areas; and when detainees were provided with toilet paper.

Finally, plaintiffs maintain their rights were violated because they were: denied spousal visitation and were not permitted to correspond in writing; they were only allowed one fifteen minute visit per week with their children and one such visit was canceled when plaintiffs told one another that they loved each other; and they were housed with convicted felons.

Defendants maintain conditions the plaintiffs were subjected to did not violate the constitution and were only temporary. Furthermore, defendants assert the plaintiffs suffered no injury or adverse health consequences.

We believe there are genuine issues of material fact that preclude entry of judgment in defendants' favor on this claim. Plaintiffs maintain Melanie developed wheezing and breathing difficulties because of the air quality problems within the jail. Plaintiffs also maintain they suffered physical discomfort because of the cold temperatures at the facility and were harmed

-40-

other ways as a result of the conditions under which they were confined.  As noted above, defendants have not provided the court with any information, by affidavit or other means, regarding meals, the provision of hygiene items, when detainees are allowed to shower, when detainees are furnished clean clothing and bedding, the cleaning of the jail, the detainees opportunity to exercise, how the temperature is controlled, etc.

### *Motion for Summary Judgment of Jason Brisco, Paul Woodruff, and Lyle Smith*

The City Defendants move for summary judgment on all claims asserted against them.

**(A).  *The Traffic Stop, the Use of Force, and the Pursuit***

"A traffic stop is reasonable under the Fourth Amendment if it is supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred." *United States v. Herrera-Gonzalez*, 474 F.3d 1105, 1009 (8th Cir. 2007)(internal quotation marks and citation omitted).  Furthermore:

> Even if the officer was mistaken in concluding that a traffic violation occurred, the stop does not violate the Fourth Amendment if the mistake was an objectively reasonable one.  *United States v. Martin*, 411 F.3d 998, 1001 (8th Cir. 2005)(noting that "[t]he determinative question is not whether [the defendant] actually violated the Motor Vehicle Code . . . but whether an objectively reasonable police officer could have formed a reasonable suspicion that [the defendant] was committing a code violation").  While officers have an obligation to understand the law, this court should not expect them to interpret the traffic laws with the subtlety and expertise of a criminal defense attorney, and the determination of objective reasonableness is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time. Finally, the constitutional reasonableness of a traffic stop does not depend on the actual motivations of the officer involved, and the subjective intentions of the officer making the stop are irrelevant in determining the validity of the stop.

*Herrera-Gonzalez*, 474 F.3d at 1109 (internal quotation marks and citations omitted).

According to Brisco, he observed the Johnston vehicle drive onto a curb, along the sidewalk, and back down onto the highway.  *City Defts' Ex.* 7 at ¶ 4.  He also observed the

vehicle speeding, crossing the centerline, and crossing the fog line when one was present and veering to the right when no fog line was present. *See City Defts'* Ex. 7 at ¶ 5-7 & *City Defts' Ex.* 15. Based on his observations, Brisco asserts he had probable cause to believe the driver of the Johnston vehicle had violated the following provisions of Arkansas law--Ark. Code Ann. § 5-65-103 (driving while intoxicated); Ark. Code Ann. § 27-51-104 (careless driving); Ark. Code Ann. § 27-51-201 (speeding); Ark. Code Ann. § 27-51-301 (driving left of center).

After reviewing the applicable law, we conclude Brisco's traffic stop of the Johnstons was valid. *See United States v. Coney*, 456 F.3d 850, 855-56 (8th Cir. 2006)("An officer has probable cause to conduct a traffic stop when he observes even a minor traffic violation"). *See also, United States v. Herrera Martinez,* 354 F.3d 932, 933-34 (8th Cir. 2004)(concluding that the officer had probable cause to make a traffic stop where the officer observed no traffic violations other than a single fog-line crossing; *United States v. Pulliam*, 265 F.3d 736, 739 (8th Cir. 2001)(concluding that a traffic violation had occurred where the officer observed the driver drift over the fog line twice in two miles).

"A law enforcement officer may order the driver out of a vehicle during a lawful traffic stop." *Janis v. Biescheuvel*, 428 F.3d 795, 799 (8th Cir. 2005)(*citing Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977)). *See also United States v. Coleman*, 148 F.3d 897, 904 (8th Cir. 1998)(holding that traffic violations provide probable cause for stopping a car and ordering the driver and passenger out of the car). The officer may also check the driver's identification and vehicle registration and ask routine questions concerning the driver's destination and the purpose of his trip. *See United States v. Long*, 320 F.3d 795, 799

-42-

(8th Cir. 2003).  In this case, it is undisputed that Robert did not get out of his vehicle when ordered to do so by Brisco.

In *Janis* the officers suspected Richards was intoxicated.  *Janis*, 428 F.3d at 799.  The officers attempted to stop his vehicle in a thirty minute pursuit during which they employed tire-deflating spikes and a rolling roadblock.  *Id.*  When Richards finally stopped, Richards refused to get out of the car and the officers forcibly removed him.  *Id.* at 798.   One of the officers reached through the open driver's door, grabbed Richards' arms, and pried his grip from the steering wheel.  *Id.*  Richards was then pulled out of the vehicle and placed on the road face down, his arms pulled behind his back, and he was handcuffed.  *Id.*

Richards complained of pain in his left shoulder and arm.  *Janis*, 428 F.3d at 798.  He was taken to the side of the road and it was determined he was not intoxicated but suffering from diabetic shock.  *Id.*  An ambulance was called.  *Id.*

The Eighth Circuit rejected the claim that the officers had used excessive force against Richards.  *Janis,* 428 F.3d at 800.  The court concluded the use of force "was measured, brief, and appropriate to accomplish the purposes of the stop to:  1) secure Richards and his vehicle; 2) ensure that no criminal activity was afoot; and 3) preserve Richards's, the officers', and the public's safety in light of the circumstances."  *Id.*

In *Lawyer v. City of Council Bluffs*, 361 F.3d 1099, 1105 (8th Cir. 2004), Officer Clark directed Michael to get out of his vehicle to sign the citation.  *Id.*  Michael refused.  *Id.*  Clark attempted to open the door but it was locked.  *Id.*  Clark requested that the door be unlocked and Michael ignored the requests.  *Id.*  Clark then reached inside through the open window to unlock the door and open it.  *Id.*  When Clark reached inside, the window began rolling up.  *Id.*

-43-

"Whatever the cause of the window rising," the court concluded it was "objectively reasonable for Clark to believe that he was in immediate danger, as he faced the possibility that he could be dragged down the road with his arm trapped in the window if the vehicle began to move." *Id.* Clark used pepper spray against Michael and the court concluded the use was objectively reasonable. *Id.*

When Robert failed to get out of the vehicle, this entitled Brisco to use some force to remove Robert from the vehicle. *See e.g., Janis*, 428 F.3d at 799-800. Once the vehicle began to pull away, it was objectively reasonable for Brisco to believe he was in immediate danger and for him to use the baton to strike the window. *Id.* Brisco employed no other force against the plaintiffs.

Woodruff and Smith were not present at the initial stop of the Johnstons. They were not involved in the pursuit of the Johnstons.

"Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights. To establish personal liability of the Smith, as Chief of Police, [the plaintiffs] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of [their] constitutional rights." *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007)(citation and internal quotation marks omitted). General responsibility for supervising the operations of a Police Department is insufficient to establish personal involvement. *Id.* There is simply no basis on which Smith can be held liable for the initial traffic stop, the alleged use of force by Brisco, or the actions taken during the pursuit. *See e.g., Kahle v. Leonard,* 477 F.3d 544, 550 (8th Cir. 2007)(A failure-to-supervise claim may be maintained only if the official demonstrated deliberate indifference or tacit authorization of the offensive acts).

-44-

To the extent the plaintiffs contend Brisco denied their constitutional rights by refusing

Robert's request for an attorney as required by *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602,

16 L. Ed. 2d 694 (1966) and its progeny, the claim fails as a matter of law. "'[T]he remedy for

a *Miranda* violation is the exclusion from evidence of any compelled self-incrimination, not a

section 1983 action.'" *Hannon v. Sanner*, 441 F.3d 635, 636 (8th Cir. 2006)(*quoting Warren v.

City of Lincoln*, 864 F.2d 1436, 1442 (8th Cir. 1989)).

### (B). *Alleged Planting or Falsification of Evidence*

The plaintiffs maintain the box of evidence transported by Woodruff to the Arkansas

State Crime Lab in Little Rock that lab analysis showed contained methamphetamine was either

planted or the lab analysis was falsified. Woodruff testified that he transported the box of

evidence from Harrison to the State Crime Lab. *City Defts' Ex.* 8 at ¶ 4. He did not know what

was in the box, did not open the box, and did not add anything to the box or remove the box. *Id.*

at ¶ 5-6. He was not involved in analyzing the contents of the box. *Id.* at ¶ 7.

Plaintiffs merely assert that the box was not theirs and they did not possess

methamphetamine. They have pointed to nothing suggesting Woodruff planted the evidence,

that the evidence was planted, or that he was involved in anyway in analyzing the evidence or

generating the report. *See e.g., Janis v. Biesheuvel*, 428 F.3d 795, 799 (8th Cir. 2005)(Non-

moving party must produce specific facts that show that there is a genuine issue for trial). No

genuine issue of material fact exists as to this claim.

### (C). *Alleged False Statements by Woodruff and Smith*

Plaintiffs maintain that Woodruff falsely told Melanie during her interview at the Boone

County Jail that her children had lice. Plaintiffs also question the fact that he told a local

-45-

newspaper that no drugs or alcohol were involved in the case yet he was the officer who transported the box that allegedly contained methamphetamine to the State Crime Lab.

Plaintiffs have presented no evidence to Woodruff was not told by a DHS employee that the children have lice. Furthermore, plaintiffs have presented nothing to dispute or call into question Woodruff's assertion that he believed the statement that no drugs or alcohol were involved in the incident was a true statement at the time he made it. *See e.g., Janis v. Biesheuvel*, 428 F.3d 795, 799 (8th Cir. 2005)(Non-moving party must produce specific facts that show that there is a genuine issue for trial).

With respect to Smith, plaintiffs maintain he failed to report that shots were fired at the Johnstons although he heard rumors the shots were fired by Jerry Watts with the Arkansas State Police. *Plffs' Ex.* J at 7 (attached to Doc. 204). Moreover, this fact is not in any reports of the Harrison Police Department concerning the stop or pursuit of the Johnstons. *Id.*

Smith spoke to a reporter at the Harrison Daily Times following the initial event. *Plffs' Ex.* J at 8 (attached to Doc. 204). In an article that appeared in the paper on Monday, January 5, 2004, Smith indicated that an individual threw a rock at the Johnston vehicle during the police pursuit. *Id.* Smith made this statement in response to question by the newspaper. *Id.*

The article also quotes Smith as saying that reports of two children being in the vehicle were unconfirmed. *Plffs' Ex.* J at 9 (attached to Doc. 204). Finally, Smith is quoted as saying Robert had a knife. *Id.* This statement was based on a call-in "that said they saw the subject with a knife." *Id.* at 10.

Plaintiffs' claim is based on the fact that Smith reported certain "facts" to the newspaper (Robert having a knife) while not reporting others (the shots) and referring to the presence as the

-46-

children as "unconfirmed."  The Supreme Court has made clear that injury to reputation alone

cannot support a claim under § 1983.  *See Paul v. Davis*, 424 U.S. 693, 708-09, 96 S. Ct. 1155,

47 L. Ed. 2d 405 (1976).  We need not consider whether Smith's statements to the newspaper

were in defamatory because even assuming this issue was resolved in plaintiffs' favor their claim

would nevertheless fail as a matter of law.  *See e.g., Everett v. City of Chester*, 391 F. Supp. 26,

28 (D.C. Pa. 1975)("With respect to the statements concerning plaintiffs' arrest and incarceration

made by members of the Chester Police Department to the local media, the law is clear that the

Civil Rights Act does not give rise to a cause of action for defamation").

### (D).  *Confiscated or Seized Items*

Plaintiffs maintain they have requested return of a pistol, ball bat, a map, and a

checkbook, all of which were seized during the search of their vehicle.  As all these items may

legally be possessed, plaintiffs maintain they are not evidence of criminal activity.

The Fourth Amendment prohibits unreasonable searches and seizures.  U.S. Const.

amend. IV.  "Generally, searches or seizures conducted without prior approval by a judge or

magistrate are unreasonable under the Fourth Amendment."  *United States v. Kimhong Thi Le*,

474 F.3d 511, 514 (8th Cir. 2007)(citation omitted).  As with nearly every general rule,

exceptions are recognized.  *Id.*  One exception to the warrant requirement is recognized "for

searching a vehicle lawfully impounded by law enforcement officers."  *Id.* (citation omitted).

"Impoundment of a vehicle for the safety of property and the public is a valid community

caretaking function of the police, which does not requirement a warrant."  *Id.* (internal quotation

marks and citation omitted).  When a vehicle is lawfully impounded, "[l]aw enforcement may

-47-

search [the] . . . vehicle to inventory its contents without obtaining a warrant." *Kimhong Thi Le*, 474 F.3d at 515.

Another recognized exception to the warrant requirement is referred to as the "automobile exception." *See e.g., United States v. Wells*, 347 F.3d 280, 287 (8th Cir. 2003). Under the automobile exception, "if law enforcement had probable cause to believe the vehicle contained contraband or other evidence of crime" the vehicle may be searched without a warrant. *Id.* (*citing Carroll v. United States*, 267 U.S. 132, 158-59, 45 S. Ct. 280, 69 L. Ed. 2d 543 (1925)).

Thus, to the extent plaintiffs challenge the search of the vehicle, their claims fail. With respect to the alleged deprivations of their property, these claims also fail. The Supreme Court has held that the negligent or intentional deprivation of property does not violate due process so long as adequate post-deprivation remedies exist. *See Hudson v. Palmer*, 468 U.S. 517, 533, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984)(intentional deprivation of property does not violate due process when meaningful post-deprivation remedy is available). *See also Barnett v. Centoni*, 31 F.3d 813 (9th Cir. 1994)(negligent or intentional deprivation of prisoner's property fails to state claim under § 1983 if state has adequate post-deprivation remedy). Plaintiffs can file a motion a replevin action for return of the property, *Drug Task Force for the Thirteenth Judicial District v. Hoffman*, 353 Ark. 182, 114 S. W. 3d 213 (2003)(utilizing Ark. Code Ann. § 18-60-804 which provides a remedy for recovery of property in the possession of another), a motion for return of the seized property, Ark. R. Crim. P. 15.2, or a conversion action, *Elliot v. Hurst*, 307 Ark. 134, 817 S.W.2d 877, 880 (1991)(cause of action for conversion lies where distinct act of dominion is exerted over property in denial of owner's right).

-48-

With respect to the pistol, plaintiffs also maintain their Second Amendment rights have been violated by the defendants' failure to return the pistol and by the suspension of their right to bear arms.  Plaintiffs state they have been told by Woodruff that the pistol could be returned to a family member.

The Second Amendment protects the right of individuals to privately possess and bear firearms.  U.S. Const. amend. 2.  However, statutes prohibiting the possession of firearms by those convicted of felony criminal offenses have repeatedly been upheld.  *See e.g., United States v. Wilson*, 315 F.3d 972 (8th Cir. 2003)(upholding as constitutional 18 U.S.C. § 922(g)(1)).  Under Ark. Code Ann. § 5-73-103, any person, unless authorized by the Governor, his designee, or the Bureau of Alcohol, Tobacco, Firearms and Explosives of the United States Department of Justice, or other bureau or office designated by the Department of Justice, who has been convicted of a felony is prohibited from possessing or owning a firearm.

Although plaintiffs maintain their felony convictions were wrongful, they cannot overturn those convictions through the use of a civil rights action brought in this court.  *Heck v. Humphrey*, 512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994).  No Second Amendment violation has occurred.  Under the applicable statute, plaintiffs may not possess or own the pistol.  Moreover, plaintiffs state they have been informed by the Harrison Police Department that the pistol can be returned to a member of plaintiffs' family.

**(E).  *Alleged Violation of 42 U.S.C. § 1981 by failing to Apprehend and Prosecute the Individual Throwing the Rock***

Plaintiffs maintain the City defendants deprived them of the full and equal benefit of the laws when they failed to establish that they arrested, charged, and prosecuted the Harrison

-49-

resident who threw the rock at the Johnstons' vehicle.  Plaintiffs note Harrison police officers witnessed the rock throwing incident and an unidentified Harrison officer instructed that the individual be arrested.

Section 1981 "provides that all persons shall have the same right to 'make and enforce contracts' and the right to 'the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'" *Bediako v. Stein Mart, Inc.*, 354 F.3d 835, 839 (8th Cir. 2004)(quoting 42 U.S.C. § 1981(a)-(b)).

To establish a prima facie case of discrimination under the Full-and-Equal Benefit clause of § 1981, plaintiffs must show that: (1) they are members of a protected class; (2) the defendants intended to discriminate on a constitutionally prohibited basis; and (3) that the discrimination interfered with a protected activity as defined in § 1981.  *Bediako v. Stein Mart, Inc.*, 354 F.3d at 839.  Further, a showing of state action is required.  *Adams v. Boy Scouts of America-Chickasaw Council*, 271 F.3d 769, 777 (8th Cir. 2001)(citing *Youngblood v. Hy-Vee Food Stores, Inc.*, 266 F.3d 851, 855 (8th Cir. 2001)).

The plaintiffs claims fail because there is no allegation that they belong to a protected class.  Nor is there any allegation that the defendants intended to discriminate against the plaintiffs based on their membership in a protected class or that the plaintiffs were treated differently than similar situated nonmembers of the protected class.  *Turner v. Gonzales*, 421 F.3d 688, 694 (8th Cir. 2005).

**(F).  *Claims under 42 U.S.C. §§ 1985 and 1986***

Plaintiffs allege the defendants conspired to deter them from attending court on April 8, 2005, by intimidation, and threat of force.  Plaintiffs assert claims under both 42 U.S.C. § § 1985 & 1986.

-50-

A claim under § 1985 is premised upon the existence of an alleged conspiracy which must be motivated by a class-based animus. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268-69 (1993). Plaintiffs have not alleged they are members of a protected class nor have they alleged that the alleged conspiracy was based upon a class-based animus. Finally, no claim exists under § 1986 as in order to be liable under § 1986 a defendant must have neglected or refused to prevent a § 1985 conspiracy. *See Steele v. City of Bemidji*, 257 F.3d 902, 906 (8th Cir. 2001)(*citing Brandon v. Lotter*, 157 F. 3d 537, 539 (8th Cir. 1998)); *see also Gatlin v. Green*, 362 F.3d 1089, 1095 (8th Cir. 2004)(a § 1986 claim must be predicated upon a valid § 1985 claim).

### (G). *Claims under 42 U.S.C. § 1987 and 42 U.S.C. § 1988*

Plaintiffs purport to assert a claim under 42 U.S.C. § 1987. Section 1987 authorizes the United States attorneys, marshals, deputy marshals, the United States magistrate judges, with the power to arrest, imprison, or bail offenders, and any other officer specifically empowered by the President to institute prosecution of the violations of certain civil rights statutes. Obviously, plaintiffs have no authority to prosecute the defendants under this statute.

Plaintiffs also purport to assert a claim under 42 U.S.C. § 1988. Section 1988 does not provide for a separate cause of action. *See e.g., Rose v. Kenyon College*, 211 F. Supp. 2d 931, 939 (S.D. Ohio 2002). Section 1988 merely provides for the application of common law in civil rights proceedings brought under other statutes and for attorneys' fees and experts' fees in civil rights cases. *Id.*

-51-

**(H).** *Claims under RICO*

Finally, we believe plaintiffs have failed to state a cause of action under the Racketeer Influenced and Corrupt Organizations Act (RICO) against the City Defendants.  Section 1962(c) of RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in . . . interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  "Section 1964(c) allows a private party, who has been injured in his property from a RICO violation, to sue for damages." *Wisdom v. Fist Midwest Bank of Poplar Bluff*, 167 F.3d 402, 406 (8th Cir. 1999).  "To state a RICO claim, the [plaintiffs] must show '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Id.* (*quoting Sedima, S.P.R.L. V. Imrex Co., Inc.*, 473 U.S. 479, 496, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985)).

For a pattern to exist there must be at least two acts of racketeering activity.  18 U.S.C. § 1961(5).  These acts must be related and must "amount to or pose a threat of continued criminal activity." *United Healthcare Corp. v. American Trade Ins. Co., Ltd.*, 88 F.3d 563, 571 (8th Cir. 1996)(citation omitted).  In defining racketeering activity § 1961(1) lists the various predicate acts that will support a RICO claim.  18 U.S.C. § 1961(1).

Here, plaintiffs allege that the defendants' racketeering activity consists of violating the constitutional rights of citizens, including the denial of due process, causing families and citizens to expend time for court appearances and court costs, fines, or fees as a result of unlawful arrests, discouraging through investigations of underlying allegations of unlawful detainment, false police reports, police brutality, use of excessive force, and denial of due process. *Complaint* at ¶ 233.

-52-

The term racketeering activity is defined to include a variety of criminal offenses under state and federal law including murder, kidnaping, gambling, arson, robbery, bribery, extortion, and obstruction of justice.  18 U.S.C. § 1961(1).  Unlawful arrests, violations of due process, and other general violations of constitutional rights such as those alleged by the plaintiffs are not among the offenses included in the definition of racketeering activity.  Plaintiffs' RICO claims therefore fail.  Moreover, there is no suggestion that the predicate acts amount to, or pose a threat of, continued criminal activity.

## CONCLUSION

I therefore recommend as follows: (1) the motion for summary judgment filed by Danny Hickman, Jason Day, and Boone County (the County Defendants) (Doc. 170) be granted with respect to all claims **except** plaintiffs' claim that they were subjected to unconstitutional conditions of confinement while in the Boone County Jail; and (2) the motion for summary judgment filed by Jason Brisco, Lyle Smith, and Paul Woodruff (the City Defendants) (Doc. 184) be granted and all claims against these defendants be dismissed.

**The parties have ten days from receipt of this report and recommendations to file objections to the same pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 8th day of May 2007.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)